## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 22 2019, 8:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT A.P.

Joann M. Price Franklin
Merrillville, Indiana

ATTORNEY FOR APPELLANT K.D.

Deidre L. Monroe
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of
E.P. (Minor Child) and A.P.
(Father) and K.D. (Mother)

A.P. (Father) and
K.D. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Plaintiff*

May 22, 2019

Court of Appeals Case No.
18A-JT-2949

Appeal from the
Lake Superior Court

The Honorable
Thomas P. Stefaniak, Jr., Judge

Trial Court Cause No.
45D06-1711-JT-300

**Vaidik, Chief Judge.**

# Case Summary

[1] A.P. ("Father") and K.D. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to E.P. ("Child"). We affirm.

# Facts and Procedural History

[2] The undisputed facts are set forth in the trial court's order.[1] Father and Mother are the biological parents of Child, who was born in June 2014. Father has two other children and Mother has three other children that Parents do not share and are not involved in this appeal.

[3] In May 2016, Child, who was one at the time, was living in Chicago with Father and his three-year-old daughter ("Child's sibling"), and Mother was living at the Mosley Motel in Gary. On May 17 at 1:00 p.m., Lake County emergency medical services (EMS) was called to Mother's motel room, where Father was "trying to save [Mother] from dying from heroin." Ex. E. After arriving at the scene, EMS saw that Mother was "rolling around on the ground, complaining of pain." Tr. p. 10. EMS believed that Mother was suffering from heroin withdrawal, took her to the hospital, and contacted the Department of

---

[1] Father argues that "[t]he trial court simply stated that the 'allegations in the petition are true' and neglected to consider the evidence germane to maintaining Father's parental rights." Father's Br. p. 10. That is not so. For example, the trial court found that "Father was compliant with visitations with [Child] from January 2017 through August 2017." Father's App. Vol. II p. 3. Furthermore, we do not agree that the trial court's findings are merely a recitation of the evidence presented at the termination hearing. While the order references evidence, it also contains thoughtful findings that flow from that evidence. As such, we conclude that the trial court's findings of fact are sufficient, and because neither Mother nor Father otherwise challenges the findings, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

Child Services (DCS) to report that Child was at the motel with an "unidentified male." *Id.*

[4] DCS assessment worker Leticia Flores responded and found that the "unidentified male" was Father. Father explained that he had brought Child and Child's sibling to the motel from Illinois because Mother told him that she was going to commit suicide if he did not come. Father said that he thought bringing the children "would make [Mother] not want to do drugs any longer." *Id.* at 11. Father said that Mother was known to abuse heroin and that she had been "dope sick" for the last four days. Father also said that he did not know whether Mother had recently used heroin because she did not use it in front of him or the children. *Id.* Father told Flores that he smoked marijuana the previous week, but when Flores tried to give him an instant drug screen, he could not produce enough saliva to complete the test. After speaking with Father, DCS workers took custody of Child, and Flores went to the hospital to speak with Mother. During Flores' discussion with her, Mother admitted to using heroin the prior day, and her toxicology report showed that she had "benzoates, opiates, and THC" in her system. *Id.* at 14. When Flores told Mother that DCS had taken custody of Child, she became irate. Mother tried to pull out her IV and threw her vomit bucket at Flores. Later that day, Child was placed in emergency foster care, and DCS filed a petition alleging Child to be a Child in Need of Services (CHINS). DCS also filed a request to take Child into custody.

Two days later, on May 19, the court held a hearing on the CHINS petition and detention request. Father denied the allegations in the petition. Mother was still in the hospital and did not appear, so the court continued the initial hearing on the CHINS petition so that Mother could be present. Regarding DCS's request to take custody of Child, the court authorized Child to be placed with Father for "an extended visit" in Illinois pending the completion of procedures under the Interstate Compact on the Placement of Children (ICPC). Ex. G. The court also ordered Parents to submit to random drug screens and to complete substance-abuse assessments, clinical assessments, and parenting assessments. Mother was permitted to have supervised visitation with Child. On July 13, the court resumed the initial hearing on the CHINS petition. Mother appeared and admitted the allegations in the petition. Father denied the allegations, and the court set a fact-finding hearing for August 2016. During the fact-finding hearing, the court heard evidence that some members of Father's Illinois household did not complete the ICPC background checks and that Illinois had denied the ICPC. Following the hearing, the court found that Child was a CHINS and ordered that Child be removed from Father's care because he had not complied with the ICPC process. Child was placed in foster care with R.G. and his family. The court also ordered that Parents participate in services, including supervised visitation, drug screens, clinical assessments, substance-abuse assessments, and parenting assessments. Parents completed their substance-abuse assessments, but Mother did not complete her intensive outpatient program as recommended. Parents submitted to some drug screens but did not complete all the required drug screens. For instance, the court

ordered Parents to submit to drug screens twice a week, but during an eight-month period, Mother only submitted to thirteen drug screens and Father only submitted to seventeen or eighteen drug screens. Later, in February 2017, Parents stopped submitting to drug screens altogether, even though they were still obligated to do so.

[6] For a time, Parents participated in supervised visitation with Child, but on September 14, Parents were detained by police because they brought drug paraphernalia to one of their visits with Child. After that, DCS requested, and the court ordered, that visitation be suspended until Parents participated in services and tested negative for drugs for thirty days. Parents never participated in services or tested negative for drugs for thirty days to restore visitation with Child.

[7] In November 2017, DCS filed a petition to terminate Parents' parental rights, and the trial court set a fact-finding hearing for August 21, 2018. The day of the hearing, Parents requested, and the court granted, a continuance to give Parents an opportunity to participate in saliva drug screens as well as hair-follicle drug screens. In the first drug screens that Parents had completed in eighteen months, Father tested positive for THC, heroin, and morphine, and Mother tested positive for THC, cocaine, heroin, morphine, and fentanyl. Neither parent ever completed a hair-follicle drug screen. Then, on September 26, Mother took another saliva drug screen. That day, she tested positive for THC, cocaine, heroin, morphine, fentanyl, and tramadol, and after this drug screen, Family Case Manager Anabel Castillo received a call from Forensic Fluids

explaining that this drug screen showed that Mother had a lethal amount of fentanyl and heroin in her system.

[8]     On October 16, the court resumed the fact-finding hearing on the termination petition. Flores testified that when Child was removed from Mother's motel room, aside from the drug-related issues, she was concerned that Father had brought Child to the motel knowing that Mother "was saying that she was going to kill herself if he didn't come." Tr. p. 15. FCM Castillo said that although Child was placed with Father after the detention hearing and remained in his care until August 2016, Child was later removed because "Father did not comply with the ICPC process and for that reason Illinois decided to deny the ICPC." *Id*. at 31. Aside from not complying with the ICPC process, FCM Castillo testified that Father did not comply with drug screens or other services throughout the CHINS case. Regarding Mother, FCM Castillo testified that she continued to test positive for drugs throughout the CHINS case and that in Mother's September 26 drug screen, there was a lethal amount of fentanyl and heroin in her system. As far as housing, FCM Castillo said that throughout the CHINS case, Parents lived in various motels and, at one point, "they were living in a tent in the woods." *Id*. at 36. FCM Castillo stated that termination of Parents' parental rights and adoption by Child's foster family is in Child's best interests. R.G. testified that Child had been placed with his family for two-and-a-half years and that they would pursue adoption of Child if Parents' parental rights were terminated. R.G. said that Child had not had any visits with Parents in over a year and that she "no longer speaks [about

or] asks any questions about her prior family." *Id*. at 55. In November 2018, the court issued its order terminating Parents' parental rights.

[9] Father and Mother separately appeal.

# Discussion and Decision

[10] Parents contend that the evidence is insufficient to support the trial court's order terminating their parental rights to Child. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of trial court. *Id*. When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id*. To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[11] A petition to terminate parental rights must allege, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[12] Parents first argue that there is insufficient evidence to support the trial court's conclusion that the conditions resulting in Child's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[13]     Here, Parents failed to demonstrate that they were any closer to providing Child a safe, stable home than they were at the beginning of the CHINS case. The trial court found that Mother is taking lethal amounts of drugs and Father continues to test positive for heroin, morphine, and THC. The trial court determined that neither parent accepted services offered by DCS and that Parents have continued with "their dangerous lifestyles and continue to experience lack of housing." Mother's App. Vol. II p. 4. As such, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.[2]

[14]     Next, Mother argues that the trial court erred in concluding that termination is in Child's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. "Moreover, the testimony of service providers

---

[2] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

may support a finding that termination is in the child's best interests." *In re Z.B.*, 108 N.E.3d 895, 903 (Ind. Ct. App. 2018), *trans. denied*.

[15] Here, in addition to Mother's substance-abuse issues that necessitated DCS involvement and her complete lack of progress since then, FCM Castillo testified that terminating Mother's parental rights would serve the best interests of Child. *See* Tr. p. 35. Furthermore, the trial court found that Child has been in the same foster home for the past two-and-a-half years (over half her life) and is bonded to her foster family. *See* Mother's App. Vol. II p. 4. Finally, the trial court concluded that it would "be unfair to [Child] to delay such permanency on the very remote likelihood of [Parents] committing to and completing services." *Id*. Therefore, the trial court did not err when it determined that termination is in Child's best interests. *See also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships"); *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).

[16] Affirmed.

Kirsch, J., and Altice, J., concur.